Sears, Roebuck & Company, Plaintiff-Appellant and Cross-Respondent, v. Department of Industry, Labor & Human Relations, Defendant-Respondent and Cross-Appellant. [Case No. 77–004.]

Montgomery Ward Company, Inc., Plaintiff-Appellant and Cross-Respondent, v. Department of Industry, Labor & Human Relations, Defendant-Respondent and Cross-Appellant. [Case No. 77–129.]

Supreme Court

*Nos. 77–004, 77–129. Argued May 29, 1979.—*
*Decided June 29, 1979.*
(Also reported in 280 N.W.2d 240.)

No. 77–004—

No. 77–129—

For the appellant there were briefs by *John A. Hazelwood, Patricia A. Graczyk* and *Quarles & Brady* of Milwaukee, and oral argument by *Mr. Hazelwood.* [Case No. 77–004.]

For the respondent the cause was argued by *Jay M. Wexler,* attorney, Enforcements Section, with whom on the brief was *Uclair W. Brandt,* chief counsel. [Case No. 77–004.]

For the appellant there were briefs by *John S. Skilton, Richard H. Porter, Michael P. Erhard* and *Foley & Lardner* of Milwaukee, and oral argument by *Mr. Skilton.* [Case No. 77–129.]

For the respondent there was a brief and oral argument by *Jay M. Wexler,* attorney, Enforcements Section. [Case No. 77–129.]

DAY, J.   These are actions to review decisions to the Department of Industry, Labor and Human Relations. (DILHR). In each case DILHR affirmed decisions of the Appeal Tribunal which determined that certain individuals known as "catalog sales merchants" in the case of Sears, and as "catalog sales agents" in the case of Montgomery Ward (Ward) were employees within the meaning of sec. 108.02(3), Stats., and that Sears and Ward were liable for past due and delinquent unemployment compensation contributions. DILHR also affirmed that portion of the Appeal Tribunal's decisions determining that employees of these catalog sales merchants or agents were also employees of Sears and Ward within the meaning of sec. 108.02(3). Case No. 77–004, *Sears*

*Roebuck & Company v. DILHR* was heard before the Honorable George R. Currie, Reserve Circuit Judge. The judgment, entered May 2, 1977, affirmed that portion of DILHR's decision which determined that Sears catalog sales merchants were employees of Sears within the meaning of sec. 108.02(3), and reversed that portion of DILHR's decision which determined that employees of Sears catalog sales merchants were employees of Sears within the meaning of sec. 108.02(3), and remanded the matter for further proceedings consistent with the court's decision. Case No. 77–129, *Montgomery Ward & Company, Inc. v. DILHR,* was heard before the Honorable Michael B. Torphy, Jr., Circuit Judge. The judgment entered June 16, 1977, affirmed that portion of DILHR's decision which determined that Ward's catalog sales agents were employees of Ward within the meaning of sec. 108.02(3), and reversed that portion of the decision which determined that employees of Ward catalog sales agents were employees within the meaning of sec. 108.02(3), and remanded the matter for further proceedings consistent with the court's decision. Sears and Ward appeal those portions of the decisions determining that catalog sales merchants or agents are their employees for unemployment compensation purposes. DILHR takes a cross-appeal from those portions of the judgments which reversed and remanded DILHR's determination that employees of such catalog sales merchants or agents were employees of Sears and Ward for unemployment compensation purposes. Because of the identity of the legal issues involved, these cases have been consolidated on appeal and will be decided in a single opinion.

The questions presented by this appeal are:

1. Did Sears and Ward meet their burdens to show that catalog merchants or agents are not their statutory employees by showing that they are free from their

direction and control and that they are customarily engaged in independently established businesses as required by sec. 108.02 (3) (b) ?

2. If the catalog merchants and agents are employees of Sears and Ward, are workers performing services for such merchants and agents necessarily also statutory employees of Sears and Ward?

■

We hold that Sears and Ward did not make the necessary showings required by the statute to show that these catalog merchants or agents were not their employees. However, we continue to adhere to the rule of *Price County Telephone Co. v. Lord,* 47 Wis.2d 704, 177 N.W.2d 904 (1970), that an individual may be an employee for purposes of his own employment compensation and at the same time be an employer subject to the contribution provisions of ch. 108 for the protection of those who work for him.

Sears is a large retail distributor of general merchandise. It sells merchandise to the general public through retail stores, and through its catalogs. Generally, Sears has one or more retail stores located in all cities or metropolitan areas sufficiently populous to warrant such operations. In smaller communities that are unable to support a retail store, Sears operated company-owned catalog sales offices which sell merchandise from the Sears catalog. There is no controversy as to the status of individuals employed in the retail stores and the company-owned catalog sales offices. In still smaller rural communities, generally with population of 3,000 to 3,500 people, where Sears does not operate company-owned facilities, Sears authorizes catalog sales merchants. Such merchants are local residents who own or lease store facilities from which they solicit orders and distribute merchandise through the Sears catalogs. The question presented by this appeal is

whether such merchants and their employees are statutory employees of Sears for purposes of unemployment compensation. At issue are the calendar years 1971 through September, 1975.

Montgomery Ward is also engaged in general retail and catalog merchandising nationally. It, too, maintains retail stores and catalog order stores whose employees are conceded by Ward to be statutory employees under the unemployment compensation law. It contracts with individuals in the less densely populated areas of the state to become catalog sales agents to distribute its merchandise. Like Sears, it takes the position that such individuals are independent contractors, and not employees of Ward. The calendar years of 1971 through 1973 are at issue here.

QUESTION #1: DID SEARS AND WARD MEET THEIR BURDENS TO SHOW THAT CATALOG MERCHANTS OR AGENTS ARE NOT THEIR STATUTORY EMPLOYEES BY SHOWING THAT THEY ARE FREE FROM THEIR DIRECTION AND CONTROL AND THAT THEY ARE CUSTOMARILY ENGAGED IN INDEPENDENTLY ESTABLISHED BUSINESSES AS REQUIRED BY SEC. 108.02(3)(b)?

The word "employee" for purposes of the unemployment compensation law is defined at sec. 108.02(3), Stats. (1971):

"108.02. **Definitions**. . . . (3) EMPLOYE. (a) 'Employe' means any individual who is or has been performing services for an employing unit, in an employment, whether or not he is paid directly by such employing unit; except as provided in par. (b). If a contractor performing services for an employing unit is an employe under this subsection and not an employer subject to the contribution provisions of this chapter, a person employed by the contractor in fulfillment of his

contract with the employing unit shall be considered the employe of the employing unit.

"(b) Paragraph (a) shall not apply to an individual performing services for an employing unit if the employing unit satisfies the department as to both the following conditions:

"1. That such individual has been and will continue to be free from the employing unit's control or direction over the performance of his services both under his contract and in fact; and

"2. That such services have been performed in an independently established trade, business or profession in which the individual is customarily engaged."

The definition is identical in the 1973 version of the statute.

In each case, DILHR affirmed the conclusion of the Appeal Tribunal that the appellants had failed to offer satisfactory proof that these catalog sales merchants or agents were free of the employing unit's control or direction over the performance of their services both under their contracts and in fact, and that such services have been performed in an independently established trade, business or profession in which the individual is engaged. In order to prevail, the putative employer must show that the individuals in question met the tests of both paragraphs (b)1 and (b)2 of sec. 108.02(3).

This court is bound to apply the definition of "employee" provided by ch. 108. This was the rule of *Moorman Mfg. Co. v. Industrial Comm.*, 241 Wis. 200, 203, 5 N.W.2d 743 (1942) in which the court said:

"We shall assume that under the facts Elliott was a common-law independent contractor. But this does not necessarily bar him from being an employee under the act. His status under the act must be determined from the act itself in view of the purpose of the act as declared therein."

In *Transport Oil, Inc. v. Cummings*, 54 Wis.2d 256, 267, 195 N.W.2d 649 (1972), the court treated the two tests of sec. 108.02(3)(b) as factual questions, and affirmed the finding of the department because it was supported by credible evidence:

"Under the provisions of sec. 108.02(3)(b), Stats., all the fact finder must do is find that the claimant is not exempted by either condition 1 or condition 2. Here the appeal tribunal found that Cummings was not exempted by condition 2 and was, therefore, an employee under the statute. On appeal this court need only consider whether the evidence supports that conclusion. Sec. 108.09(7) provides that findings of fact made under this chapter are conclusive, absent fraud. As otherwise expressed, findings of the department will not be set aside if there is any credible evidence to support them." (Footnotes omitted.)

Findings of fact made by the department under Ch. 108 are conclusive if supported by any credible evidence in the record. *R. T. Madden, Inc. v. I.L.H.R. Dept.*, 43 Wis.2d 528, 547, 169 N.W.2d 73 (1969). This court does not weigh the conflicting evidence to determine what shall be believed. That is solely within the province of the administrative agency. *Id.* It is not necessary that the findings of the department be supported by a preponderance of the evidence. This court is obliged to uphold the department's findings even though they be contrary to the great weight and clear preponderance of the evidence. *Id.* at 548.

In *National G. L. Ins. Co. v. Industrial Comm.*, 26 Wis.2d 198, 131 N.W.2d 896 (1965), the court upheld the determination by the Industrial Commission that two general agents of a life insurance company, Beebe and Ciulla, were the company's employees under sec. 108.02(3), stating:

"Under the statutory definition Beebe and Ciulla were employees of the company under paragraph (a) unless the company satisfied the commission as to both conditions of 1 and 2 of paragraph (b). The commission has found that the company failed to establish either condition. Unless the evidence compels the finding that both have been met, the commission's decision was properly confirmed by the circuit court.

" . . . .

"We cannot decide upon this record that as a matter of law, Ciulla was free from the company's control or direction of the performance of his services." *Id.* at 208–209.

The appellants assert that as a matter of law the facts established at the hearing show that the catalog sales agents or merchants were not their employees. Because we hold as we do, we find it unnecessary to recite all the facts established at the hearings in great detail. Rather, we look to the evidence supporting DILHR's finding.

The evidence as to Sears established the following:

The merchant owns or leases a store facility from which he solicits orders and distributes merchandise through the Sears catalog. The merchant is required to advertise his relationship with Sears as "John Doe, Sears Authorized Catalog Merchant." If the merchant uses a business card, the Sears approved format is "Sears Authorized Catalog Sales Merchant-Owned And Operated by JOHN P. JONES."

The merchant is required to display on the front and rear of the store signs which read SEARS AUTHORIZED CATALOG SALES MERCHANT followed by the merchant's name.

Sears also provides window decals, signs, display equipment, and microfilm readers on consignment which the merchant may use. Sears supplies its own order forms. The merchant may use order forms other than those fur-

nished, provided they are mutually agreed upon by the merchant and Sears.

Merchants may engage in other business activities, including other retail selling operations. However, the merchant may not conduct any other catalog sales business. If the merchant, along with his Sears catalog business, engages in some other form of retailing and includes such goods in his stores, he is required to post signs indicating that such items are not part of his Sears merchant operation.

The merchant's income comes from a nine to nine and one-half percent commission on net sales. He can also realize income from the delivery of merchandise from the store to the customer's home, and from carrying charges for credit which he extends. Some merchants do extend their own credit or accept bank credit cards. The merchant may make sales through the Sears credit card. If the customer does not have a Sears credit account, his use of Sears credit must initially be approved by Sears.

The merchant may not locate his stores outside the trade area defined by the contract, although he may solicit and receive orders from customers who live outside the area.

The merchant does not take title to the Sears merchandise he sells. Title passes directly from Sears to the customer when the customer receives the merchandise. The merchant is required to remit all cash received for Sears merchandise prior to the close of business on the day following its receipt. Allowing him to retain this cash for any extended period of time would be costly to Sears.

In addition to keeping his own books, the merchant must keep accurate records of receipts, disbursements and inventory of Sears merchandise. Sears reviews these records annually. In addition to his daily cash reports,

the merchant reports his general sales of Sears merchandise on a weekly basis. No reports are submitted to Sears on the merchant's non-Sears activities.

Either party may terminate the agreement at the conclusion of its term by giving written notice at least sixty days before expiration. Either party may terminate the agreement promptly if any default under any of the terms and provisions of the agreement continues uncorrected for thirty days after written notice. If either party is delinquent in the payment of an indebtedness or monies provided for in the agreement, the agreement may be terminated on thirty days written notice. A merchant is delinquent if any sums owed to Sears are not paid to Sears at the close of the merchant's third regular business day following their receipt by the merchant. Default could consist of the merchant's failure to obtain insurance coverage in the amounts required by Sears, or merchant's failure to maintain premises "in a clean, safe, and attractive condition in accordance with Sears standards of appearance . . ." for example.

The contract requires the merchant to accomplish the transfer of customer orders, payments, returns and necessary reports at the times specified in the contract, and in accordance with instructions furnished by Sears. Orders for merchandise must be transmitted to Sears prior to the close of the business day next following their receipt. Payments of all sums due to Sears, including, but not limited to cash orders, payments on Sears credit accounts, and C.O.D. collections must be made prior to the close of the business day next following their receipt.

Sears reserves the right to review the merchant's books and records and to inspect the premises at reasonable times to determine compliance with the terms and provisions of the agreement.

The contract provides that merchandise will be sold "at current catalog prices, including applicable tax and

shipping charges, or at other price to be mutually agreed upon with Sears." Although the contract specifies that the merchant must charge the Sears catalog price, unless Sears consents to another price, there was testimony that the merchant may reduce the cost to the customer by accepting trade-ins, stamps, or by special markdowns. The merchant must account to Sears at the catalog price.

The evidence as to Ward established the following:

The contract requires that the agent operate a catalog agency store under his name as owner, but the words "Montgomery Ward Catalog Sales Agency" or "Ward Catalog Sales Agency" must be used in conjunction with his name. The agency must be operated at all times in accordance with Montgomery Ward Sales Agency Policies and Montgomery Ward Agency Procedures from time to time in effect ("Current Policies And Procedures.") [1] The agent must provide store space satisfactory to Ward. If the agent leases his store, the lease must be in a form prescribed by Ward, unless Ward

---

[1] Some excerpts from the "Policies and Procedures" were:

"Customer impressions are vital to the success of the Agency, so the physical appearance, both inside and outside, and the hours of operation must be conducive to this end. . . .

"Merchandise must always be displayed attractively, priced, and kept clean. Use of Promotional Display Pricing & Selling Aids Manual, Monthly Display Properties and Translite Posters will help Sales Agents to achieve a more effective operation.

"Used, shopworn or damaged merchandise should not be displayed unless it is identified as such.

"Display properties being used should be those described in the current month's Promotion Service.

"Windows and floors must be kept clean and free of any undesirable material.

"The sign should always be turned on during business hours when outside light is dull, or when it is completely dark and the Sales Agency is open to serve customers.

"In addition, it is good advertising to leave the sign on in the evening, through those hours when pedestrian or vehicular traffic passing the agency is significant."

authorizes changes in writing. The contract requires the agent to devote his full time and best efforts to the operation of the agency store and may not engage in any activity which will injure or prejudice the name, goodwill, or reputation of Ward, but there was testimony that agents engage in other business activities. Ward reserves the right at all times to audit the books and records of the agent and to inspect the premises.

The agents are guaranteed no minimum compensation from Ward, but instead receive commissions on their gross sales. Agents are not required to meet minimum sales quotas.

Although catalog agents set their own hours, the policy manual provides that the sales agent "should carefully arrange the business hours of his agency to coincide with customer convenience and with the hours maintained by competitors and other retail business establishments in the community." Catalog sales agents are visited by Ward representatives once every six or seven weeks for consultation purposes. Catalog sales agents are required to submit weekly remittance reports to Ward, but no other reports are required. Ward audits of catalog agencies are done "in house" on the basis of Ward record of billings and remittances.

The contract provides for termination under the following circumstances:

"(a) Either party hereto may terminate this Agreement as of the anniversary date of this Agreement in any years by mailing written notice of its election to do so to the other party sixty (60) or more days before the effective date of such termination.

"(b) In the event (i) that Agent shall misappropriate customers' merchandise, (ii) that Agent shall fail to follow Current Policies and Procedures, (iii) that Agent shall fail to keep the Agency open to the general public for business for any consecutive three (3) day period in accordance with Current Policies and Procedures, (iv) that any voluntary petition in bankruptcy shall be filed

by Agent, or that an involuntary petition in bankruptcy shall be filed against Agent, or that a receiver shall be appointed for Agent or his property, (v) that Agent shall admit in writing his inability to meet his debts as they mature, or (vi) in the event of the death of Agent, Wards may forthwith terminate this Agreement by notice to Agent."

"(c) Either party may terminate this Agreement by notice to the other party if any default (other than a default of the nature described in paragraph (b) above) of the other party under this Agreement shall continue uncorrected for thirty days after written notice thereof to the other party."

It is argued that the statutory control test of sec. 108.02(3)(b)1 is merely a restatement of the common law test for independent contractor, stated in *Jahns v. Milwaukee Mut. Ins. Co.*, 37 Wis.2d 524, 528, 155 N.W.2d 674 (1968): "In Wisconsin the principal point of distinction between an employee or agent and an independent contractor is the degree of retention by the employer or principal of the right to control the manner in which the details of the work are to be performed."

The language of the statute is "that such individual has been and will continue to be free from the employing unit's control or direction *over the performances of his services* both under his contract and his fact. . . ." Assuming, *arguendo*, that this formulation has the same meaning as the common law test, the record clearly shows the controls that Sears and Ward exercise over these merchants and agents. Such controls are so pervasive that the department could reasonably conclude that the appellants had failed to meet their burdens to establish that such individuals were free from their control or direction in the performance of their duties under the contract.

In *Transport Oil, Inc. v. Cummings, supra,* 54 Wis.2d at 261–262, 195 N.W.2d 649 (1972), this court approved the department's interpretation that ["for an individual to be customarily engaged in an] independently established trade, business or profession, . . . it must be such a business as the person has a proprietary interest in, an interest which he alone controls and is able to sell or give away."

The contract between Sears and the merchant specifically provides that it is

". . . a personal one and may not be sold, transferred or assigned either voluntarily or by operation of law by either party without the written consent of the other. However, Sears consent to the Merchant to either transfer or assign this Agreement will be not unreasonably withheld, and transfer and assignment will be allowed where assignee satisfies the reputation and business qualifications generally required by Sears in its selection of Merchants."

The testimony at the hearing was that twenty-five of the forty Wisconsin merchant businesses have changed hands. Sears argues that the actual practice shows that these businesses are, in fact, freely transferable. The fact remains, however, that Sears has a right to veto the transfer. Although Sears may not unreasonably withhold its consent, the contractual language hardly fulfills the requirement that the business be one that "the person has a proprietary interest in, an interest which he *alone* controls and is able to sell or give away." (Emphasis added.)

In the case of Montgomery Ward, the contract provides that the agent may not assign the agreement without the prior written consent of Ward. Upon termination of the agreement for any reason, the agent must, if Ward so elects, assign the agency store lease

to Ward or to anyone designated by Ward. If the agency store is owned by the agent, the agent agrees that if the agreement is terminated for any reason, he will lease the agency stores to anyone designated by Ward for a period, as may be specified by Ward, of not more than one year, under a form lease prescribed by Ward. Under the contract, the agent agrees not to engage in competition with Ward during a period of two years from the termination of the agreement.

In each case, DILHR was justified in finding that the test of sec. 108.02(3)(b)2, Stats., had not been met: that the services of these merchants and agents were performed "in an independently established trade, business or profession in which the individual is engaged."

It is immaterial whether these merchants and agents fall within the protections of the Wisconsin Fair Dealership Law, ch. 135, Wis. Stats. The question of whether an individual is an employee for unemployment compensation purposes must be determined according to the statutory definition of employee, *Moorman Mfg. Co., supra,* 241 Wis. at 203. Sec. 108.02(3) does not except from the definition of "employee" individuals who may be "dealers" under ch. 135. In addition, although sec. 108.02(5) contains a long list of exemptions from the term "employment," there is no exemption for "franchisees" or "dealers." To argue that the unemployment compensation statute simply does not "fit" the catalog merchant business is to ignore the requirement that questions of unemployment compensation must be decided according to statutory definitions. It is evident that the statute was drafted to provide broad coverage.

QUESTION #2: IF THE CATALOG MERCHANTS AND AGENTS ARE EMPLOYEES OF SEARS AND WARD, ARE WORKERS PERFORMING

SERVICES FOR SUCH MERCHANTS AND AGENTS NECESSARILY ALSO STATUTORY EMPLOYEES OF SEARS AND WARD?

The trial courts relied on *Price County Telephone Co. v. Lord,* 47 Wis.2d 704, 177 N.W.2d 904 (1970). In that case, Price County Telephone Company contracted with Virgil Lord, d/b/a Prentice Switching Company to operate a manual telephone exchange. Prentice employed several telephone operators and other personnel. The question on appeal was whether Lord or Price County Telephone Company was liable for contributions to the unemployment compensation fund as the statutory employer. The court stated in that case:

"If it can be conceded that Lord was a statutory employee of Price County Telephone Company, that does not necessarily mean that Price County is responsible to the instant claimants. There is nothing in the statute to preclude one from being an employee for purposes of his own unemployment compensation protection and at the same time being an employer subject to the contribution provision of the chapter for the protection of those who work for him. Under this statute these two conditions are not mutually exclusive. If it were impossible to be both at the same time then the phrase 'not an employer subject to the contribution provisions of this chapter' in par. (a) would be superfluous." *Id.* at 716.

In Price County Telephone Company, the court distinguished *National G. L. Ins. Co. v. Industrial Comm., supra.* That case involved a coverage question of whether a secretary in the office of a general agent or an insurance company was an employee of the insurance company so as to be eligible for unemployment compensation. In its analysis, the court concluded that she was an employee, if the agents were employees. However, in that case there was no claim that the agents were

employers "subject to the contribution provisions" of ch. 108.

We decline to overrule the holding of *Price County Telephone*.

*By the Court.*—Judgments affirmed.